The Chief Justice
delivered the opinion of the Court:
This is an appeal for the purpose of reviewing the rulings of the Justice who sat in the special term at the trial of the issues sent to it from the Orphans’ Court, upon a, caveat filed in that court by the appellants, to the admission to probate of the last will and testament and a codicil thereto, of the late Allan McLane, who died in the city of Washington in December, 1891, and who was at the time of his death a resident of the District of Columbia. The will bears date, and was executed, March 27, 1888, and the codicil the 27th day of August, 1888 — both papers having therefore been executed more than three years before the death of the testator. The issues so sent for trial in the special term were as follows:
1. Was the paper writing bearing date the 27th day of March, 1888, offered as the last will and testament.of Allan McLane, and the paper writing bearing date the 27th day of August, 1888, offered as a codicil to said last -will and testament, and if either of them, which, procured by the fraud, misrepresentation or artifice of Abby K. McLane or of James L. McLane or of either of them, or of any other person, or persons?
2. Were the paper writings offered as the last will and testament of the said Allan McLane and as the codicil thereto, or was either of them, and if either of them, which, executed under the undue influence, importunities, suggestions or persuasions of the said Abby McLane and James *556 L. McLane, or of either of them, or of any other person or persons?
During the tidal certain exceptions were taken by the caveators to the rejection by the court of evidence offered by them; and at the conclusion of the evidence offered by the caveators the caveatees moved the court to direct the jury to render a verdict in favor of the validity of the will.
•Thereupon the court instructed the jury that the caveators had given no evidence that fairly tended to invalidate the will, and directed the jury to return a verdict for the caveatees, which the jury did accordingly. To the giving of this instruction to tire jury by the court and to the rendition of the verdict by the jury in accordance therewith the caveators ¿excepted.
As the matter of the latter exceptions seems to be most relied on by the caveatore as furnishing ground upon which this court should order a new trial, it will be first considered.
The caveators and contestants of the will are Anne Cropper, a daughter and only surviving child of the testator, and John Cropper, her husband, and the caveatees and proponents of the will are Abby K. McLane, widow of the testator, and James L. McLane, a brother of the testator, who are respectively nominated as executrix and executor thereof. The charge is that the will was procured by fraud and undue influence.
Judge Redfield, in his treatise on the Law of Wills (p. 510), says: “Fraud 'and undue influence are so nearly synonymous that it will not be important to enter into the definition of possible distinctions between them, since the result of either must be the same upon -the testamentary act. In regard to express fraud, the cases are variant. As where the testator, near the time of his decease, being pressed to execute a second will, inquired whether it was the same as the former, and was told that it was, and executed it under that impression, it was held that this testimony was admissible to show the will thus executed fraudulent, and thus to set up the former will.”
*557 And in note 1 on the same page: “ Many of the cases have labored the distinction between fraud and undue influence. The latter is undoubtedly the more extended term, and includes a great number of cases, and an almost indefinite extent and variety of means to accomplish its purposes, which are not included in the former. So that, while undue influence embraces .fraud, fraud by no means embraces every species of undue influence.”
In Tyson vs. Tyson, 37 Md., 582, the court expresses the rule in this language: “In regard to undue influence, it is equally well settled that in order to invalidate a will on this ground, it must be such as to deprive the testator of his free agency and subordinate his will to that of another, thus making the testamentary act not the will of the testator, but that of the person exercising the dominion or control over him.”
In Conley vs. Nailor, 118 U. S., 135, the court says: “ The undue influence for which a will or deed will be annulled must be such as that the party making it has no free will, but stands in vinculis; if must amount to force or coercion, destroying free agency., That is- undue influence which amounts to constraint, which substituted the will of'anodier for that of the testator. It may be either through threats or fraud; but however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the time» when the instrument is made;” citing a number of authorities.
In Mackall vs. Mackall, 135 U. S., 172, the court says: “ Influence gained by kindness and affection will not be regarded as ‘ undue/ if no imposition or fraud be practiced, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. Matter of Gleespin’s Will, 26 N. J. Eq., 523. * * * Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence. Lee vs. Lee, 71 N. C., 139. Nor does the fact that the testator on his *558 deathbed was surrounded by beneficiaries in his will. Bundy vs. McKnight, 48 Indiana, 502. * * * Nor that the testator, an old and helpless man, made his will in favor of a son who had for years cared for him and attended to his business affairs, his other children having forsaken him. Elliott’s Will, 2 J. J. Marsh, 340; S. C. Redf. Am. Cas. on Wills, 434. * * * It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.
Undue influence must destroy free agency. It is well settled, that in order to avoid a will on the ground of undue influence, it must appear that the testator’s free agency was destroyed, and .that his will was overborne by excessive importunity, imposition or fraud, so that the will does not, in fact, express his wishes at to the disposition of his property, but those of the person exercising the influence.”
The rule laid down by Greenleaf is: “It must be an influence obtained either by flattery, excessive importunity or threats, or in some other mode by which dominion is acquired over the will of the testator, destroying his free agency, and constraining him to do, against his will, what he is unable to refuse.” 2 Greenl. on Ev., Sec. 688 (14th Ed.).
“ 1. To destroy the freedom of the testator’s will, and thus render his act obviously more the offspring of the will of others than of ,his. 2. That it must be an influence especially directed towards the object of procuring a will in favor of particular parties. 3. If any degree of free agency or capacity remained with the testator, so that when left to himself, he was capable of making a valid will, then the influence which so controls him as to render his making a will of no effect, must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty, and it must have proved successful to some extent, certainly.” 1 Redfield on Wills, 4th Ed., 524, 525.
*559 In Children’s Aid Society vs. Loveridge, 70 N. Y., 387-394, the court says: “In order to avoid a will upon any such ground, it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed full agency, or which, by importunity which could not be resisted, constrained the testator to do what was against his free will and desire, but which he was unable to refuse or too weak to resist.”
These authorities are sufficient to show the established definition of fraud and undue influence, and in this jurisdiction especially the decisions quoted, rendered by the Suprenie Court of the ¡United States, are the paramount law. We have carefully noted the authorities on this subject referred to by counsel for the caveators, and find they substantially concur with the cases we have cited. Counsel for caveators .have referred to authorities as to the admissibility of particular evidence and the effect the same should have in proving fraud or undue influence, which it is not now necessary to consider.
It may be well in this connection to refer to some authorities upon the rule which should guide the court in withdrawing a case from the consideration of the jury.
In Pleasants vs. Fant, 22 Wallace, 121, the Supreme Court of the United States thus states the rule, Justice Miller delivering the opinion:
“It is the duty of a court in its relations to the jury to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial. This is done by making plain to them the issues they are to try, by admitting Only such evidence as is proper in these issues, and rejecting all else; by instructing them in the rules of law by which that evidence is to be examined and applied, and finally, when necessary, by setting aside a verdict which is unsupported by evidence or contrary to law.
“In the discharge of this duty it is the province of the *560 court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether on all the evidence the preponderating weight is in his favor — that is the business of the jury — but conceding to all the evidence offered the greatest probative force which according to the law of evidence it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court, after a verdict, to set it aside and grant a new trial. Must the court go through the idle ceremony in such a case of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that if the jury should find a verdict in favor of plaintiff, that Verdict would be set aside, and a new trial had? Such a proposition is absurd, and accordingly we hold the trae principle to be, that if the court is satisfied that conceding all the inferences which the jury justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the ']uvj.”
In Randall vs. B. & O. R. R., 109 U. S., 479-482, Mr. Justice Gray said: “It is the settled law of this court, that when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant.”
See also Montclair vs. Dana, 107 U. S., 162; Baylis vs. Ins. Co., 113 U. S., 319; Goodlett vs. Railroad Co., 122 U. S., 391.
This rule as to the powers and duty of the court has in more recent decisions of the Supreme Court of the United States been recognized as well in reversing as affirming the action of the inferior court in withdrawing the case from the consideration of the jury.
See Texas Pacific R. R. Co. vs. Cox, 145 U. S., 593, and the cases there cited.
*561 But it was intimated by counsel for caveators that while courts might properly exercise this control over verdicts, in ordinaiy actions, especially where the issue is as to negligence, it ought not to be allowed in will contests where the issue is as to fraud or undue influence. No satisfactory reason was given and we cannot perceive any for such a discrimination, and the authorities are abundant to the contrary.
The Supreme Court of Pennsylvania in Herster vs. Herster, where the issue was as to fraud and undue influence in procuring a will, held:
“ There is, in our opinion, no evidence from which ,the jury would be justified in inferring fraud, duress, or undue influence in the making of this will. In an issue of devistavit vel non, the' question of mental unsoundness or undue influence ought not to be submitted to the jury where the evidence is of such unsatisfactory character that the court would not sustain a verdict upon it. A court of law has a higher duty to perform than merely to answer points of law. It is its duty to see that the law is forthwith administered, and such administration requires that a man’s will, the most solemn instrument he can execute, shall not be set aside without sufficient evidence to impeach it. There is no redress here for an erroneous or improper verdict, but when a case is submitted to a jury upon clearly insufficient evidence, such as no court ought to sustain a verdict upon, it is our .plain duty to reverse.”
And in Tyson vs. Tyson, 37 Md., 581, the Court of Appeals of that State held: “We do not propose to review the many cases in which the question as to the legal sufficiency of evidence has been considered by the court. It is sufficient to say they all hold the rule to be, that whenever the evidence offered is of such a character that no rational mind could infer the fact ought to be established by it, it is the duty of the court, upon application, to instruct the jury .that there is no evidence before them legally sufficient to warrant their finding the fact so attempted to be proved.”
*562 This, too, was in case of issues in reference to a will alleged to have been procured by fraud and undue influence. Cases 'upon this point might be multiplied, but enough have been cited to illustrate the rule. The question for our solution is, ought the jury, upon the testimony offered by the caveators, in view of all the circumstances developed by it, fairly considered by them, had the cause been left to their determination, to have rendered a verdict for the caveatees? In contrast it may be said that the supposition that the jury if left free from the direction of the court might possibly have returned a different verdict cannot aid us, since the inquiry is not what might the jury have done, but what ought they in the proper, legal exercise of their function as jurors, in good conscience, to have done. If from the evidence submitted by the caveators, the jury would not be justified in inferring fraud or undue influence in the 'making of this will, it was the plain duty of the justice presiding to direct the jury to return a verdict for the caveatees in accordance with the rule adopted by the Supreme Court of the United States in repeated instances, which if not in accord with the weight of authority elsewhefe, as we think it is, would yet be the absolute rule for our guidance.
Having determined some -of the principles of law, as we think applicable to- a proper investigation of this case, we turn to the testimony produced by the caveators on the trial of these issues. The evidence is voluminous, covering about 350 printed pages. Any fair condensation of it would exceed the proper limits of this opinion. We have carefully read and considered the entire testimony, but will only refer to such portions of it as may be necessary in announcing our conclusions.
There were but four witnesses examined. They were the caveators, Anne Cropper, Bridget Maguire, Smith Thompson, and W. K. Chapman.
Mr. Thompson is a clerk in the office of the Register of Wills, and was called for 'the purpose only of proving certain papers on file in that office and the rate of commissions allowed executors in the District of Columbia.
*563 Bridget Maguire was for some years a nurse living in .the family of Mr. Allan McLane, the testator, and her testimony takes up about three of the 495 pages of the record.
W. K. Chapman was Mr. McLane’s coachman, who testified that in 1886 or 1887, he drove Mr. Allan McLane, General Joseph B. Johnston and Mr. Baldwin, to the office of Gordon & Gordon, and while they were there Mr. Jas. L. McLane came.
Mrs. Cropper, the caveator, and daughter of the testator, is therefore the only other witness who testified in the case. The other evidence in the case consists of:
(a) The will and codicil.
(b) The inventory of the personal estate, which, according to the Orphans’ Court appraisement, is valued at $373,-372.00.
(.c) The letters of the testator, Allan McLane, written to his daughter, Anne Cropper, and to her husband, John Cropper, and their letters to him, and several letters written by him to other persons.
(1d) Several letters written by Miss Nellie Hunt to Miss Cropper, a sister of John Cropper.
Allan McLane, at the time of his death in December, 1891, was in the sixty-eighth year of his age. He executed his will in March, 1888, and a codicil in the following August.
His letters and .the testimony of his daughter show that he was á truthful, courageous, high-toned gentleman, well educated, intelligent, possessing a strong will and great force of character.
In the early part of the decade of 1850-1860, he married his first wife, Miss Marion Bache, of Washington, who lived but a short time, and died without children.
Thereafter, in the year 1856, he married in Portsmouth, New Hampshire, Miss Knight, whose father was then dead, being at the time of his death a resident in the State of California, and had died leaving but little property, and a widow and three daughters. By this marriage with Miss *564 Knight, Mr. McLane had four children, all of whom died in their infancy, except his daughter Anne, the caveator, who was born March 11, 1859.
In the early part of the decade, 1860-1870, Mr. McLane took his wife’s youngest sister, Miss Abby Knight, then a girl of about 12 years of age, to live with him and his wife, her mother "also living in the household a part of each year. This condition ‘of things continued till the year 1871, when Mr. McLane went to Europe for his wife’s health, taking with him his daughter and Miss Abby Knight; the latter returning to America in the following year. Mr. McLane remained in Europe until the fall of 1877 (his wife dying there in 1874), when he returned to America. He again in 1878 went to Europe with his daughter and Miss Abby Knight, returning in 1879 to Washington. In 1880 he moved into his house at 1500 Vermont Avenue, which he had built for himself, where he resided with his daughter, Miss Abby Knight, and her mother, as members of his household until the marriage of his daughter, in 1881, to Mr. John Cropper. Upon their marriage Mr. and Mrs. Cropper resided in New York, where the former had previously resided, and from that time Miss Knight and her mother remained as members of Mr. McLane’s household until his marriage with Miss Abby Knight in October, 1887, and from thence until his death in December, 1891, the members of his household were himself, his wife, and her mother. It would appear that Miss Abby Knight had been mainly reared, educated and supported after Mr. McLane’s marriage to her sister in 1856 — at least from i860 — by Mr. McLane, her mother being a widow of limited income. In March, 1888, Allan McLane executed his will. At that time his daughter had no children, nor had she any at the time of the trial of this case. Her husband was a lawyer, and as Mrs. Cropper testifies, possessed of a considerable estate, the income from which furnished them a handsome support.
After Mr. McLane’s last marriage, he and his family, for *565 the greater part of each summer, resided at Narragansett Pier, where, in 1885, he built a cottage which he called “ Gillian Lodge,” which they occupied as a summer residence until his death.
On the 27th of March, 1888, Mr. McLane executed the will now in question, by which he appointed his wife executrix, and his brother, James L. McLane, executor of the same. Pie gave to his wife $5,000 for her service’s as executrix, also $5,000 to be paid to her immediately after his death, and the lot and dwelling house on Vermont Avenue, with the furniture, etc., therein, excepting certain articles which were given to his daughter Anne. The value of the Vermont-Avenue property and furniture is said to have been about $60,000.
He gave to his daughter Anne, absolutely his interest in a San Francisco water lot property, said to be ,of the value of $1,800; Gillian Lodge and furniture, said to be of the value of $30,000; and also all interest in a life insurance policy for $10,000.
• The fifth paragraph of the will is as follows:
“ Fifth. After the payment of my debts, expenses of probate of this my last will and testament, and of the legacies herein mentioned, I direct that the balance of my estate, real, personal and mixed, of which I shall die possessed, or to which I shall be entitled at the time of my death, and wheresoever situate, be divided into two equal parts or shares, and I give, devise and bequeath one part or share of the said two equal parts or shares, unto my wife, Abby, her heirs, executors or administrators, the same to be received by her in lieu of dower. The other or remaining part or share of said two equal parts or shares of the balance of my said estate, in the event of my leaving me surviving a' .child or children of my wife Abby, or in the event of there being bom to me of my wife Abby a posthumous child or children, I give, devise and bequeath in fee unto my daughter Anne and to such child or children by my wife Abby, share and share alike. In the event, however, of my not leaving me surviv *566 ing a child or .children of my wife Abby, or in the event of there not being born to me, of my said wife, a posthumous child or children, then I givfe, devise and bequeath the said other and remaining part or share of said two equal parts or shares of the balance 'of my said estate, unto my brother, James L. McLane, 'his heirs, executors, and administrators, in trust to take the rents, issues and profits thereof, and apply the same to the use of my said daughter Anne (paying the same over to her) for life, and upon her death, to pay over the principal thereof, with all accumulation, to her children and grandchildren, said grandchildren to take per stirpes and not per capita. And in case my said daughter Anne shall die without issue her surviving, then I direct my said trustee to divide the said remaining part of the two equal parts or shares of the balance of my said estate, into ten equal parts or shares, which I give, devise and bequeath as follows:
(a) To my sister, Mrs. Rebecca Hamilton, the income for life from one part or share, and at her death the principal is to fall back into this remaining part or share of my estate for division as hereinafter provided for.
(b) To my niece, Charlotte B. McLane, daughter of my deceased brother, Charles B. McLane, one part or share.
(c) To my sister, Mrs. Mary Robbins, two parts or shares.
(d) To my brother, James L. McLane, three parts or shares.
(e) To my nephew, Allan McLane (son of my brother, James L. McLane), one part or share. .
(f) To my wife, Abby, two parts or shares.
Provided, however, that should any of the above-named party or parties, in this division of the said remaining part of the two equal shares of the balance of my estate die during the lifetime of my daughter Anne — then I direct that the share or shares given to him, her or them, as also the share given for life to my sister, Rebecca Hamilton, shall be divided amongst those who may then survive, in the proportions above mentioned.”
*567 Learning that his daughter had expressed a desire to live in Washington,.in May, 1888, he proposed to give her $15,000 with which to build a house in Washington-, which offer was accepted, and the house was built and occupied by Mr. and Mrs. Cropper in September, 1889, and thereafter, as their home until the decease of Mr. McLane. The sum of $1,500 was added to the original sum of $15,000 to meet an excess in the cost of the house over the original estimate.
On the 27th day of August, 1888, Mr. McLane executed a codicil to his will, of which the following is the material part:
“'Whereas, in paragraph “third” of my aforesaid last will and testament, I made a gift and devise, with certain provisions there appearing, unto my daughter Anne and her heirs, of my cottage property at Narragansett Pier, R. I., known as “ Gillian Lodge,” inclusive of the dwelling house and land, and the stable and land, and with all the appurtenances to both belonging, and inclusive of all the household furniture in the dwelling house belonging to me, with all other articles therein belonging to me; therefore, I now make this codicil (No. 1) in order to, and I do hereby, revoke the said gift and devise unto my said daughter Anne and her heirs, made in 'said paragraph “ third ” of my aforesaid last will and testament; and further, I do hereby now give and devise all the same, and said property referred to, at my death, unto my wife Abby and her heirs; the said gift and devise has reference alone to the land (two acres) now embraced in my original purchase for “ Gillian Lodge ” (with the house, stable and other property referred to) but not to any more land which I may hereafter purchase adjacent.”
The testimony of Mrs. Cropper, together with the letters of Mr. McLane to her, commencing March 25th, 1883, and extending to late in the summer of 1888, show that he always manifested the deepest and most tender affection for his daughter. Indeed, such seems from the testimony to *568 have been the fact to the date of the testator’s death. And this affection seems to have been ardently returned by the daughter. True, there were some unpleasant episodes. One occurred when, on May 31st, 1887, Mr. McLane, in a letter to his daughter, - announced his intended marriage to Miss Knight, and gave his reason therefor. In her reply, Mrs. Cropper, while avowing that she loves -her father too tenderly and is too dutiful a child ever to'embarrass him in one word or deed, yet says in speaking of the contemplated marriage, “ I do not like, nor I never will like it, or be reconciled,” with some other expressions that must have been very unpleasant to her father. On June 5th, 1887, he replies to his daughter’s letter, saying, “ I received your letter of the 2d inst., and read the same with' profound emotion and only further recur to it to say that since our views, &c., &c., are now clearly defined to each other, my desire is for its subject to be forevermore a sealed one as between yoú and ,1.” He then closes his letter with references to family relatives and friends in the usual style; and his subsequent letters to her were of the same considerate and affectionate character as theretofore.
Mr. and Mrs. Cropper attended the marriage of Mr. McLane’in October, 1887, Portsmouth, N. H., and apparently Mrs. Cropper and her father retained all of their former affection.
On the 30th of November, 1887, Mr. McLane invited his daughter and her husband to visit him at his Vermont Avenue home, and referred to a difficulty between Mr. Cropper and his sister, caused by a change in the religious views of the latter, to which it would appear Mrs. Cropper adverted in a letter to her father. After advising what he thought would be a proper course for Mr. Cropper in the matter— that it would be the better way to not speak of the subject, especially out of the family, he further says that from what he had heard, Mr. Cropper’s sister is considering the propriety of making application to the courts for the transfer of the trusteeship of the estate to some other party upon the *569 ground that the excitement resulting from her change of religion has unfitted him to act impartially, and also that some California land interests of the estate have not been followed up. He does not espouse the cause of the sister in any particular, nor intimate his belief of the truth of the reports circulated against Mr. Cropper, but in language most wise and considerate counsels and advises a course that would lead to the restoration of peace and happiness in the Cropper family.
On October nth, 1887, Mr. Cropper wrote Mr. McLane that his sister had just been told in the course of a visit to a personal friend, that Anne (his wife) and himself were behaving very badly in regard to his recent marriage, and that their chief objection was that he (Cropper) thought that he would not receive as much money from Mr. McLane as he (Cropper) had been in the habit of. He says: “ I take this, occasion to say that I never 'said anything of the kind.” He says he had been asked several times since his marriage what allowance Mr. McLane made Anne, and “I have always answered that he made her none, as such, but that you had each year given her a very large' and handsome Christmas present.” Mr. Cropper then proceeds to say that Anne had been very guarded in speaking of the subject, and had always given answers when questioned in relation thereto with due respect to her father and herself. Mr. McLane 'on the following day answered, and as it is brief, we give it in full:
“ My dear sir: In reply to yours of yesterday, I will only say that I regret you should think it necessary to make any explanations to me (or others), regarding the subject referred to; and trust that you will not .again, resting assured, that hear what I may, I am far above even doubting the loyalty or affection or unselfishness, in their relations to me, of my daughter, or of her husband; and I hope I shall have as little reason to doubt their discretion in the matter.
“ With love to Anne, I remain.”
On the 27th of May, 1888, Mr. McLane wrote Mr. Cropper:
*570 “ In view of the contemplated move to Washington of you and my daughter, and of my desire that there should be no ‘clouds’ between us and our households; living specially in such proximity; (and also that no injustice may rest upon any one concerned) I am constrained to allude to a very personal and painful matter; briefly, then, it has come to my knowledge, and I am compelled from apparently irrefragable evidence, as it now stands, to believe it, that you have ‘given expression’ to unkind and unfriendly criticism and feeling in connection with the marriage, etc., of myself and my present wife; and to several persons, strangers no less than to intimates, all of which is still unatoned for, if not the reverse; and all of which ‘ expressions of opinion’ should have been avoided and prevented, I think, by our past, present and future relations, ties and status. I shall ,be glad in your acknowledgment and reply to this, to learn and have your assurance that I have been misled and am, in any way, mistaken; for I am very solicitous that the future in all our lives may be, and 'as among ourselves, bright and stainless and happy.”
It may be well to mention that on the 24th of May, 1888, Mr. Cropper had written a letter to Mr. McLane, thanking him for the proposed gift to Anne of money to build a house in Washington, and adverting to a passage in the letter of Mr. McLane to his daughter, in which-the former proposed to give her a house, in regard to reports of an unpleasant nature. In this letter he says:
“ I regret to see by your letter that reports have come to you which have hurt your feelings. I only wish to say on thiat subject that wfe are not responsible for them. Anne’s affection for you has been too great for her to originate them, and 1 on my part have never said anything but that you made Anne a very handsome Christmas present, and until the -trouble in our family caused by Rosina arose I do not think I ever mentioned the amount, and then to only two 'or three.”
The only reply to this was in a letter of the 26th of May, 1888, by Mr. McLane, which we extract as follows:
*571 “ I have read carefully your remarks, on the other subject personal specially to myself, alluded to by you; and deem it proper for me to express the hope that, hereafter, matters to which I am the principal may be treated with due reserve by you.”
In reply to the letters of Mr. McLane of the 26th and 27th of May, before quoted, Mr. Cropper on the 29th of the same month writes:
“You seem to think that what has been said in criticism of your present to Anne has originated with us. If you will recall our interview at the time of my engagement you will remember that I asked for nothing nor have I since made any such request. When your first check of $1,000 came to Anne the year after our marriage my first impression was to ask her to tell you that I thought it too large, but when I considered the matter fully I came to think that an only child could accept anything from her father. I have invariably spoken of it as a very handsome present and no word of discontent has ever come from either of us. Until late I have never mentioned the amount, and for the last two or three years the amount has not been mentioned to my sisters. They knew that Anne had received a-present, but the amount was not specifically told them. They most probably thought it was the same. Certain members of your family at the time of our marriage expected that you were to make a large settlement on Anne, and from time to time different members of your family have asked her if such was not the case. She simply said no, but made no comment and neither have I. Whatever has been said of an adverse nature did not come from us or with our advice. It has lately come to us that Anne’s wardrobe was criticised by several. She has dressed herself exactly as she wished and with my approval. She has not spent her money entirely on her clothes; has bought several handsome things, among which is some lace, the counterpart of which none of her relations have. The whole amount of the present to *572 her has been spent by herself, on herself and as she wished, and no paid of it has been spent on anything else.
“In regard to yours of the 27th inst., I would say that I have not made comments and criticisms on your late marriage. I have had many things' said to me but I have not endorsed them. This spring while Miss Hunt was in New York, I had a conversation with her in which I was told that you had commissioned her through your wife in one instance and through Mrs. Knight in another to sound me on the subject. I talked very freely with her and sent an answer to be delivered to you by her. Whether you have seen her or not I do not know, but what I told her is what I now tell you. In many instances, both to the world and your family, before your marriage, I have defended the lady who is now your wife. Last autumn I wrote to you about a report which I have strong reason to believe came from the Emmets, as it came to me from a source with which they have intimate connections. As Anne and I have never said one word to the Emmets, either about what you gave her or about your marriage, I immediately wrote to you to stop what I considered pure malice. Your answer was that your loyalty to Anne and myself was too great to listen to or believe such reports.
“When I married I thought I should not only obtain a wife, but I hoped also to have a father, and to be to you a son (for no one who has not been an orphan can understand what it is) and tried to show it, as for instance, my care of you at Narragansett during your serious illness in the summer of 1883. It gradually appeared to me that it was not acceptable, and I tried to do my duty without being in the way.
“There is no one who wishes to be on good term’s with his connections more than I, and I have always tried to treat Anne’s relations with proper respect and consideration. I do not recall any occasion when I have slighted any of them. If there are any clouds between our households they are not of Anne’s or my making. I have en *573 deavored to be clear in what I have to say on this delicate and painful subject, but I 'think that a personal interview may be more satisfactory.”
On 31st of May, 1888, Mr. McLane replied to the letter of Mr. Cropper of the 29th of May:
“ My dear sir, I received yesterday your favor of the 29th inst., which has since occupied my serious attention. You refer specially to two subjects, i. e. ‘criticisms ’ etc., regarding my gifts to my daughter Anne, since her marriage; and ' criticisms,’ etc., in connection with my late marriage, etc. As to the former, I understand from your letter that neither yourself nor Anne is responsible in any sense for the origin in the conversations you have had about said gifts, etc. At the same time I must express my regret that you should have felt at liberty to discuss the subject to the extent you admit having done. I shall here let the matter drop and not seek further the authors of the intrusion into my private and personal affairs, to which I have tafeen objection. As to the latter subject, while greatly regretting also that my son-in-law should have become involved in its discussion, both in and out of my family, I accept, of course, your disclaimer of the grievance in the point of the inquiry I felt justified in making in my letter of the 27th inst., bearing upon alleged' criticisms, etc., on your part in connection with my marriage, etc.
“ Before closing I beg to say that in connection with thesiibstance of an interview you report having had with Miss Hunt, I did not give her any such commission which you state she had from me, either directly or indirectly; the statement is absolutely erroneous and so I have never heard anything from her since, of course, about the matter, either from you or otherwise. I will add that both Mrs. Knight and Mrs. McLane disclaim all knowledge of such an intervention as is attributed to them. However, I know Miss Hunt to be incapable of intentional misrepresentation; and so, I suppose, a misunderstanding must somewhere exist to explain the preposterous and absurd supposition and *574 statement that I had commissioned Miss Hunt to sound you on the subject of my late marriage, etc. Perhaps the following may help to clear this delusion and fiction: Early in the year the statement was made to me, and with more consequence than usual, you had been talking about the subject before alluded to, and to those outside of my confidential circle, and wishing to clear up what, if so, etc., I deem an indiscretion, I asked Mrs. McLane to request Miss Hunt in her intercourse with Miss Cropper (which I assumed and supposed to be of this intimate nature, etc.) to mention substantially to her that these confidential personal matters were 'still being talked about here in the mutual circles, to my mortification, etc.; and so you would thus be, naturally by your sister, advised and warned about the same for your guidance, etc. I now regret that I did not write you direct; but I was trying at the time to avoid ‘ an explanation ’ of so delicate a nature, or. rather to escape from the necessity of having one. I note your suggestion about a personal interview, but as I can see no wise object in the same, nor can discern any compensating results to flow therefrom, in view of detailed explanations, in connection with unpleasant matters, I beg to decline. I have not the slightest objection to the transfer of the credit from Riggs and think your proposed disposition -of it both proper and wise. I remain yours sincerely.”
A letter on the 2d of June and another on the 4th of June, and the replies of Mr. McLane thereto, are in evidence, but we do not deem it necessary to say more than that while Mr. McLane insisted the subject must be dropped, he was evidently disappointed that Mr. Cropper should noL be willing to admit it to have been an indiscretion to say anything to third persons in regard to the gifts of the former to his' daughter or to permit ‘himself to be questioned in relation thereto, or as to the marriage of Mr. McLane. It is 'evident that to Mr. McLane’s mind the conversations which Mr. Cropper admitted with others than his wife were objectionable, and it is quite as evident that Mr. Cropper *575 did not concur with his father-in-law in that view. Mr. McLane raised no question of veracity with Mr. Cropper, but accepted his denials to the full extent, so far as they related to facts, but differed as to inferences and conclusions. This is clearly manifest by the letter of Mr. McLane of July 8, 1888, to Mr. Cropper, which it seems necessary to quote to a full understanding of this matter. It is as follows:
“Deal- Sir: I have had further conference with Anne, in reference to the Washington ‘ M ’ street lot, alluded to in your letter of the 4th inst., and she understands that if she should desire to possess the said lot, to build thereon, I will in due season deed it to her, etc. As- this move, if consummated, will involve your change of residence to close proximity to my own, I propose once more to make an effort to remove from between us the unsatisfactory, to me certainly, feature of our personal relations, as they now exist; since, without such removal, our social intercourse must, of necessity, be greatly interfered with. Our .mutual self-respect can leave no other alternative; neither I think our mutual appreciation of what is and is not agreeable, in such relations, etc. Waiving details, etc., as I have heretofore explained, taking exception to your having ‘ talked/ discussed, etc., with third parties about certain of my personal affairs; and having in some instances, more or less, with some of those directly under my care and protection, (whether before or after my marriage) is not a material point. I am not taking exception to the holding or entertaining by you of opinions and views of these matters (however distasteful they might be to me, etc.) but to your having given expression to them or discussed them — especially as a son-in-law, and which, I consider, was a serious and grave liberty and requires atonement. I say ‘ especially as a son-in-law’ because that relation entitles me to a great reserve on your part, and made you also in a measure irresponsible, from my natural indisposition to seek the explanations from a daughter’s husband; with your own acknowledgments and avowals in the case, I will be now content to confront you *576 as the ground and substance of my complaint, and as the evidence of your ‘ indiscretion ’ as charged. In our late correspondence, I understand you substantially to say that you are unable to perceive wherein you have erred, etc., etc. My reply to all of which is that I (not you) am the judge. As you are aware, equally with myself, among honorable and responsible men in the world, if one considers .that he has .been insulted or offended by the word or deed of another, that other must make the necessary amends, etc. If the word or deed was not intended to offend, must still make to that effect satisfactory explanations, etc.; that is, he must disclaim all intentional offense and express his regrets for having given any occasion for any such impressions to have been received, etc. So, in this case of ours, I am, as I have repeatedly informed you, offended -by reason of certain of your references to me and mine; and it is not sufficient for you to say that you never intended yourself to be repeated, oi 'for me to hear of what you thought-or said; that was one of the chances and responsibilities you took when you allowed yourself to ‘talk/ etc., and it is for me to decide whether or not I have a right to be offended thereat. I think, in our mutual justification, as honorable men, with proper self-respect, you should accept my ‘ right ’ as explained and illustrated and as the sequence admits, etc., your absence of ‘right’ and justification for your ‘talk,’ etc., as complained of, and then, I think, with the disclaimers made heretofore, you will have no difficulty in acknowledging, freely and frankly, without reservation the ‘indiscretions’ I complained of; and of expressing your regrets for their .occurrence. If you can not thus satisfy me you .will leave me no choice but to accept the remaining alternative .alluded to.”
Mr. Cropper in reply of July 14, makes an explanation, and expression of regret with which in his response Mr. McLane declares himself satisfied. But Mr. Cropper then proceeds to mention some grievances of his own:
“I would add that I agree with you in all your remarks *577 touching the customs- that hold among honorable men, including the fact of the aggrieved one being the judge of the affront. You and I are both in middle life, as it were on the same footing, and as I make no doubt you will be as ready to atone as to ask amends from me, I now mention that about which I have remained silent for Anne’s sake. I refer in the first instance to the rudeness shown to the members of my family, and thus to me, by you and the members of your household at the time of my wedding. The particulars I omit for brevity’s sake, but will furnish them if you desire; in the second place, your discorrrteous manner to me last summer while I was a member of your household at Gillian Lodge, and during my visit to your house in Washington last winter; and in the third place, the concluding paragraph of your letter of June 5, in which you tell me that you consider my offer to accommodate matters a nullity. In all these matters I consider myself aggrieved. Hoping that this clears the whole affair, and that when your answer is received there will be no cloud left in our social atmosphere, I remain yours very truly.”
Mr. McLane in reply accepts the explanations of Mr. Cropper as to the 'subject of their previous correspondence, and then in relation to charges of rudeness and discourtesy made by Mr. Cropper says:
“ Rudeness is a strong and heavy term, when used in a personal sense, -and forms a charge serious and grave in the extreme, and under present circumstances I feel it specially so in having the accusation applied to me. I have consulted the ‘members of my household,’ Mrs. Knight and Mrs. McLane, and they unite with me in disclaiming any intention to have been rude at the period referred to, and regret with-me, if they gave any occasion for such impressions to have been received. Again, you say, ‘ in the second place, your discourteous manner to me last summer while I was a member of your household at Gillian Lodge, and during my visit at your house in Washington last winter ’— as before, to be charged with discourtesy of manner to a *578 guest under my own roof, is a serious and heavy, and not to say a very unpleasant accusation personally. I can only add, in connection with it, that I am unaware to what you refer, or of having given any occasion for the charge; and while I would be quite prepared under the circumstances to express regret for causing the impression to have been received, necessarily you must indicate if you care to pursue the ¡matter further, the special discourtesy of manner on my part to which you took exception. Again, you say, ‘ and in the third place, the concluding paragraph of your letter of the 5th of June, ult., in which you ,tell me you consider my offer to accommodate matters a nullity.’ < In all these matters I consider myself aggrieved.’ As I understand this letter of yours (of June 4) you decline to satisfy me on the points to which I have taken exception; and at the same time, make an offer of amity and harmony it is true, but which in view of the previous declarations, appeared to me to be without efficacy, and consequently void, or a ‘nullity,’ a simple English word to convey the meaning; and I certainly meant no disrespect to you in its use. In conclusion and referring to your first stated instance of grievance, I must request that you will advise your sisters of my reply to your charge against myself and family of rudeness towards them on the occasion of your marriage.”
On the 18th of June, 1888, Mr. Cropper responded to Mr. McLane as follows:
“Yours of the 16th inst. reached me yesterday, and I would say that in regard to the two first subjects I am quite satisfied. I have conveyed your message to my sister Kate as you asked, but she, in the course of events and her 'wish to be at peace with the world, has long ago overlooked anything which might have been unpleasant to her; and I would add that what is now said comes entirely from me and in no way from her. Miss Rosina Cropper for her own purpose has cultivated her connection with your household lately. She sailed for Europe on Saturday, and as my communication with her has entirely ceased I cannot deliver *579 it to her. My statements seem to take you by surprise, therefore I will go into details, as I think it only your due, although it is far from my wish to prolong the discussion. At the time of my marriage my sisters were as you knew two women entirely alone, in the world. Instead of taking this into consideration you filled the only available room in your house with one of the bridesmaids on the ground that her father and mother could not come to Washington. Mrs. Emmet was going to a hotel'with her daughter and another bridesmaid and as she was a personal friend of Miss Potter, could have taken charge of her. At wedding receptions it is customary for the representatives of the two families to receive together, but no such invitation was given to my family and they were allowed, to use a slang expression, to shift for themselves. Your brother Robert found my sister Kate standing alone in a comer ,and introduced himself, saying she must be Miss Cropper from her likeness to me. I was anxious to have her meet Miss Hunt and I had to send three messages to the lady who is now your wife before she introduced her. There was no attention shown them at supper, and even their wedding cake was given them by an outsider. The next day Miss Potter left and although my sisters were alone in a hotel, Miss Noxton was asked to fill Miss Potter’s place. You and your present wife called upon them at the hotel, and after learning that they were going to Baltimore, asked them to dine on Thanksgiving with you.”
Mr. McLane replied on the 20th of July, 1888, as follows:
“ Dear Sir: I have received and carefully noted the points of your letter of the 18th inst., and find there remains for me to supplement the following remarks and explanations to those I have already made, etc. Regarding the birthday gift of stag horns, I am under the impression I returned my acknowledgments to you for them in a letter to Anne, and written in reply to one from her referring to your intention of sending'them to me. If I did not do this, and failed also in expressing my thanks to you in person when *580 you handed them to me at Gillian Lodge, I certainly failed in due courtesy to you, and which in such case, I sincerely regret. Further, regarding your third stated grievance, I would add that I did not intend, when using the word ‘ nullity/ to convey the idea in anywise to imply that ‘ you had told a falsehood ;’ and regret that you so considered (or received such impression, which you state you did); and in doing so I think you did both yourself and me an injustice. In again closing, so far as I can see ahead — on my part— this painful correspondence with its responsibilities, I should be wanting in self-respect, and in frankness, if I- did not say to you (and yet more directly and emphatically than in my last reference to the subject) that I think you are unjustified in prejudging the case, that is, in advance of a hearing from us — and under the circumstances show a want of due personal respect towards us, in applying to me and ‘the members of my household’ the term ‘rudeness’ when you informed me that in your opinion we, on the occasion of your marriage, had failed in our obligations to your sisters.”
“July 21, 1888.
“Allan- McLane, Esq. — Dear Sir: Yours of the 20th instant reached me this morning, and in acknowledgment thereof I would only say one word more, that I am sorry that you constitute yourself the sole judge on your side but you are not willing to accord the privilege to me.
“I am yours very truly,
John Cropper.”
Mrs. Cropper testified that after the date of this letter of July 21, until they came to live in Washington the relations between her husband and her father were very strained. After they came to Washington, which was in September, 1889, they (her husband and father) became affectionate again and that this relation apparently continued until her father’s death, more than two years afterwards.
We have thus lengthened this opinion by introducing* *581 these letters, because it is from what is thereby disclosed very largely that the counsel for caveators argue that undue influence was exerted upon the testator, causing him to give to his daughter a less portion of his estate than he would if left to himself. They say that stories were manufactured by somebody about expressions and criticisms by Mr. and Mrs. Cropper as to the gifts of Mr. McLane to his daughter, and about the marriage of Mr. McLane, and these were carried to Mr. McLane by Miss 'Hunt, or some one else, either directly or through Mrs. Knight or Mrs. McLane, or both. This .theory seems to be demolished by the very letter introduced to support it. They show that the correspondence which at first commenced about the reports, and stories in circulation was continued until the matter of difference was narrowed down to what Mr. Cropper admitted he had said, and to Mr. Cropper making the proper reparation for that. Upon Mr. Cropper expressing his regret for having said that which he admitted he had said, Mr. McLane promptly expressed himself satisfied. Thereupon a new element of trouble was introduced by Mr. Cropper, charging Mr. McLane and his family with rudeness and the former with discourtesy, which did result in strained relations.
It is unnecessary that we should discuss this matter of difference between these parties, or undertake to determine the merits of the controversy. If it be admitted that his affection for his daughter was somewhat chilled by this last controversy, and that he executed the codicil to his will transferring “ Gillian Lodge ” from his daughter to his wife while under the influence of that feeling, it cannot affect the validity of the codicil.
If a testator by his will, gives to one who would inherit from him were he to die intestate a portion less than would be inherited by the same person in case of intestacy, because of resentment against that person, growing out of an actual controversy between the testator and the legatee, the will would be in nowise invalidated by that circumstance. *582 This solution of the question also disposes of whatever may, be in the letters of Miss Hunt, for her statements, whether authorized or not, related to reports and stories which were discussed and disposed of by Mr. McLane and Mr. Cropper-in the correspondence we have just considered.
Neither can it -be presumed that the will of Mr. McLane was executed under the influence of any such reports cr stories as to what had been said by the caveators about his gifts or his marriage. There is certainly no direct proof tending to establish such a fact. And it seems to us that in view of what this record conclusively establishes the character of the testator to have been, no reasonable person can read his letter of May 27, 1888, where he first addresses Mr. Cropper about these reports in the most considerate and delicate terms, and then for a moment presume that he had two months previous to that executed his will in which he discriminated against his daughter on account of enmity against her or her husband, engendered by these reports, without making any inquiry or investigation to determine the .truth or falsity thereof. He shows at all times an impatience even against permitting anything in the nature of a misunderstanding to remain without correction at the earliest possible moment.
But it is said that this is an unjust will. Mrs. Cropper received from her father, after the execution of the will, $16,500 to build a house, and by the will $10,000 insurance (to which she was entitled without the will, it is true, nevertheless it was provided by the testator and with his money), the water lot in San Francisco, $1,800, “ Gillian Lodge,” $30,000 absolutely, and some other articles of personal property, of no great commercial valúe, making $58,300 absolutely by the will. She also, by one-half of the residuum of the property placed in the hands of a trustee became entitled to the income of what is fairly estimated at $170,000. It is true that this is not quite one-half of the testator’s estate; but if his design was to place his wife and daughter in- something like equal circumstances in life, he would naturally *583 look to their situation without his bounty. His wife would be without any support substantially, while his daughter’s husband was amply able, as we are advised by the testimony, to support her in a manner comporting with what had always been her station in life. The income which she would receive from her father’s bount}'-, joined to that of her husband, would enable herself and husband to live comfortably and to gratify all reasonable tastes, their station in life considered, while that which was left to Mrs. McLane would be considerably less and would require greater economy of expenditure. By the will the portion left to Mrs. Cropper’s use during life went to her children, if she left any, absolutely; to those (excepting her husband) nearest to her and the testator. The fact that he left the most of his daughter’s portion in trust for her does not in our judgment militate against the justice of this will. Prudent fathers are constantly making such provisions in their will, especially as to daughters. By arranging his devise for the benefit of his daughter in that way, he secured a double guaranty for the support of his daughter; first, by her husband; and second, by the fortune that he placed in the hands of a trustee for her benefit.
Viewed in the light of these considerations, we are not at all prepared to say that the will is unnatural, unwise or unjust. He doubtless loved his wife devotedly, as well as his daughter, and intended to be just as between the two, as we think he was. But little need be said of the codicil, in addition to comments already made. He may have transferred “ Gillian Lodge” to his wife because of the fact that after the execution of his will he had provided a home for his daughter in Washington, and because upon reflection lie thought there would be a nearer approach to equality than without such transfer, all things considered, as between his wife and daughter.
These considerations disposed of the alleged item of evidence of undue influence arising from the claimed fact that the will is unnatural and unjust. But it is said that the *584 testator, in contemplation of marriage, declared his purpose to his daughter to make a different disposition of his property, and one more favorable to his daughter than ,the one actually made by his will. While such a circumstance is always admissible to be considered with other evidence for what it may seem in each particular case to indicate, it is never sufficient, .unsupported, to set aside a will. In a case like this, with such a testator, and such a will, with no more support than it has in this case, it is not in our judgment entitled to the consideration of a jury.
Again, it is testified by Mrs. Cropper that at the first visit made by her to her father after his marriage at Christmas, 1887, and again in May, 1888, Mrs. McLane was always present in order, as she surmised, tO' prevent any private conversation between her and her father. On cross-examination she admitted that Mrs. McLane and her mother frequently went out driving, leaving her father and herself at the house, and that either might have introduced any subject they might desire to' discuss. She .says her father did not speak of the disposition of his property, and she never in her life thought of introducing such a subject. This should be considered in connection with her statement, that after the execution of the codicil, in August, 1888, she had many interviews with her father alone during her visits to him, and that after September, 1889, there was full and free intercourse between the families and their members, including Mr. Cropper, until the last sickness of Mr. McLane, which -was but of a few days’ duration.
Again, Mrs. Cropper says that she was not admitted to see her father during his last sickness. She says that on one occasion she was told by the physician in attendance that no one but the necessary attendants should be admitted, and that she was always told that it was by order of the physician that she was not admitted. She says that when her father was very near his " death, she was sent for, but she found him unable to converse. Doubtless it was a severe trial to one so devoted as Mrs. Cropper is shown to *585 have been to her father, not to have been present during his last sickness, but such regulations are frequently absolutely necessary, and in the absence of any testimony showing a sinister motive, «none should be presumed.
We come now to the consideration of the exceptions of the caveator to the refusal by the court to admit evidence.
When the letter of Mr. McLane had been read, in which he mentioned that he had heard that Miss Rosina Cropper intended to apply to the courts for his removal as trustee because of his failure to- look after the interests in some California property, counsel for the caveatees asked Mrs. Cropper whether in point of fact her husband had anything to do with the California property. We do not think that it could properly have made any difference with the jury whether Mr. McLane believed this report or hot, or whether it was true or not. Mr. McLane did not profess, to believe it; he had heard it, and he was communicating what he heard so that Mr. Cropper might seasonably avoid trouble.
The second exception was to the refusal of the court to permit Mrs. Cropper to testify to the statements of Miss Hunt, made to her personally. This ruling was correct. The letter offered by the caveators of, Mr. McLane of May 31st shows that.he only authorized Miss Hunt to speak to Miss Cropper about the reports in order that she might warn her brother. Of course that did not constitute Miss Hunt the general agent of Mr. McLane to talk to whom she pleased.
The third exception is to a refusal of the court to admit a letter written by Miss Hunt on June 3d to Mr. Cropper. This ruling was also right, for the reason before given. She had no authority from Mr. McLane to write it, and without it, her letter would be no more admissible than the letter of any other individual.
The fourth, fifth, sixth and seventh exceptions being because of the refusal of the court to permit certain letters wiitten by Miss Hunt to sundry persons to be read in evidence, were rightly excluded by the court for the reasons before given.
*586 The eighth and ninth exceptions are evidently not well taken, the eighth for the reasons before given as to Nellie Hunt, and the ninth because the testimony related to what Mr. McLane said about the influence of James L. McLane in procuring the will of Gen. Joseph Johnston, a matter clearly irrelevant to the issues in this case.
In conclusion, it is proper that we should say that when the motion was made to the court in special term after the caveators had offered their evidence, and rested, to direct the jury to return a verdict in favor of the validity of the will, it became the duty of the court, if in its judgment, considering all the evidence that had been offered, no reasonable mind could have properly come to the conclusion that the fact of undue influence or fraud had been proved, to sustain the motion and direct a verdict accordingly. The special term did sustain the motion, and directed a verdict for the caveatees.
We have carefully reviewed the testimony so offered in the special term, and the rulings of that court to which exceptions were taken, and are of the opinion that no error to the prejudice of the caveatees is shown.
The order of the special term in overruling the motion for a new trial i? therefore sustained.